UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JILL L. TERRY,

                                    Plaintiff,

            -against-                                          5:11-CV-1296 (LEK/ATB)

COUNTY OF CAYUGA,

                                    Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

        In this employment case, Plaintiff Jill L. Terry ("Plaintiff" or "Terry") alleges that she was

terminated by Defendant County of Cayuga ("Defendant" or "the County") in retaliation for taking

leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* See

generally Dkt. No. 1 ("Complaint").  Presently before the Court is Defendant's Motion for summary

judgment.  Dkt. No. 23 ("Motion").  For the following reasons, the Motion is denied.

## II.     BACKGROUND

### A.  Personnel Actions

        In 1996, Plaintiff was appointed Counsel to the Cayuga County Department of Social

Services Support Collection Unit.  Dkt. Nos. 23-1 ("SMF") ¶ 3; 26-1("SMF Response") ¶ 3.  Eight

years later, she was appointed to the position of Assistant County Attorney, in which position she

was supervised by County Attorney Frederick Westphal ("Westphal").  SMF ¶¶ 6-8; SMF Resp. ¶¶

6-8.  Plaintiff initially worked in the Child Protective Department but was transferred to the Support

Collection Unit in 2008.  SMF ¶ 21; SMF Resp. ¶ 21.  In 2009, her County Attorney Position was

formally transferred from the Social Services Department to the County Attorney's Office.  SMF ¶

33; SMF Resp. ¶ 33. In January 2010, Westphal reappointed Plaintiff to her Assistant County Attorney position. SMF ¶ 34; SMF Resp. ¶ 34. Westphal terminated Plaintiff's employment on October 13, 2010. SMF ¶ 67; SMF Resp. ¶ 67.

### B. Leaves and Absences

Westphal approved Plaintiff's requests for a two-week FMLA leave in mid-2005, a one-week leave soon after, another one-week leave in 2007, a three-day leave in early 2009, and a two-day leave in March 2010. SMF ¶¶ 16-18, 24, 36; SMF Resp. ¶¶ 16-18, 24, 36.[1] In March 2010, Westphal granted Plaintiff's request for FMLA leave on an intermittent, as-needed basis. SMF ¶ 38; SMF Resp. ¶ 38. Westphal approved FMLA leave for Plaintiff running from September 29, 2010 to October 12, 2010. SMF ¶ 56; SMF Resp. ¶ 56.

On at least two occasions, Plaintiff was late to work because she overslept. SMF ¶ 12; SMF Resp. ¶ 12. In March 2008, Westphal had a conversation with Plaintiff that covered, at the very least, the use of "comp time." SMF ¶ 19; SMF Resp. ¶ 19; see also Dkt. No. 23-13 ("March 2008 Counseling Notice"). Five months later, Westphal spoke to Plaintiff about her absences. See SMF ¶ 20; SMF Resp. ¶ 20; Dkt. No. 23-23 ("October 2008 Counseling Notice").

### C. Use of Work Time for Personal Matters

In April 2009, Plaintiff attended a continuing legal education ("CLE") seminar. SMF ¶ 25; SMF Resp. ¶ 25. Defendant paid her attendance fee. SMF ¶¶ 26-27; SMF Resp. ¶¶ 26-27. Plaintiff left the seminar before it ended to purchase a car even though she did not have permission from Westphal to do so. SMF ¶¶ 27-30; SMF Resp. ¶¶ 27-30. Westphal was angry at Plaintiff for

---

[1] Defendant contends that all of these leaves constituted FMLA leaves, while Plaintiff argues that many of them were not officially treated as such. SMF ¶¶ 17-18, 24; 36; SMF ¶¶ 17-18, 24; 36.

leaving early and threatened to terminate her employment.  SMF ¶ 31; SMF Resp. ¶ 31.  However,

Westphal did not do so, and indeed arranged for Plaintiff to receive pay for the following day of

work, when he ordered her to be absent.  SMF ¶ 32; SMF Resp. ¶ 32.  In September 2010, Plaintiff

spent time at work making arrangements for a personal trip.  SMF ¶ 39; SMF Resp. ¶ 39.

### D.  Interactions with Other Employees

From 2007 until Plaintiff's termination, Westphal's confidential secretary, Christine Helas

("Helas"), worked in a cubicle next to Plaintiff's.  SMF ¶ 52; SMF Resp. ¶ 52.  Helas could hear

Plaintiff's phone conversations.  SMF ¶ 52; SMF Resp. ¶ 52.  Gale Gould, a supervisor in the

Cayuga County Medicaid Department since 2004, worked with Plaintiff on at least one case.  SMF

¶¶ 41-42; SMF Resp. ¶¶ 41-42.

### E.  Westphal's Review of Plaintiff's Case Files

While Plaintiff was on leave in October 2010, Westphal reviewed her case files. SMF ¶ 58;

SMF Resp. ¶ 58.[2]  Westphal's review of Plaintiff's file indicated that Plaintiff had failed to file a

default judgment in one case and proof of service in another.  SMF ¶¶ 61-63; Resp. SMF ¶¶ 61-63.[3]

### F.  County Email Account

Plaintiff had two assigned email accounts: one with an address ending in "cayugacounty.us"

("County Account") and the other with an address ending in "state.ny.us"("State Account").  SMF

¶¶ 22, 64; SMF Resp. ¶ 22, 64.  Plaintiff  was aware that some emails were sent to the County

Account.  SMF ¶ 23; SMF Resp. ¶ 23.  Plaintiff did not open emails sent to the County Account

---

[2] Plaintiff denies Defendant's allegation that Westphal accessed her computer, but does not specifically deny that he examined her paper case files.  See SMF Resp. ¶ 58.

[3] Although Plaintiff argues that the proof of service that she obtained, and which was in the case file, was proper, she does not respond to Defendant's contention that it was not filed with the court.  See SMF Resp. ¶ 63

SMF ¶ 65; SMF Resp. ¶ 65.

### G. Fitness-for-Duty Examination

In January 2010, Westphal sent a letter request, pursuant to "Section 72 of the Civil Service Law," that Plaintiff undergo a medical examination to determine whether she was "fit" to perform her duties.  SMF ¶¶ 35-36; SMF Resp. ¶¶ 35-36; <u>see also</u> Dkt. No. 23-15 ("Examination Letter").  Among the reasons Westphal offered for his request were that Plaintiff "ha[d] been absent from attendance at work for periods of time dating back to November 2009 and [wa]s frequently tardy."  SMF ¶¶ 35-36; SMF Resp. ¶¶ 35-36; Examination Letter.  Westphal noted that while Plaintiff was working in the Child Protective Department, "[t]here were repeated concerns from both the [c]ourts and her co[-]workers about her attendance and her ability to adequately perform assigned tasks."  SMF ¶¶ 35-36; SMF Resp. ¶¶ 35-36; Examination Letter.  Westphal also referred to Plaintiff's "lack of improvement in time and attendance and the significant use of sick time suggesting diminished performance."  SMF ¶¶ 35-36; SMF Resp. ¶¶ 35-36; Examination Letter.  Following the requested examination, Westphal granted Plaintiff's application for intermittent, as-needed FMLA leave.  SMF ¶¶ 37-38; SMF Resp. ¶¶ 37-38

### H. Termination

On October 13, 2010, the day Plaintiff returned from her two-week FMLA leave, Westphal informed Plaintiff that he was terminating her employment.  SMF ¶ 67; SMF Resp. ¶ 67.  He did not explicitly reference Plaintiff's performance and instead explained his decision by telling Plaintiff something along the lines of: "we have not been seeing eye to eye for some time." SMF ¶ 68; SMF Resp. ¶ 68.  Plaintiff did not ask what Westphal meant by this.  SMF ¶ 69; SMF Resp. ¶ 69.

## I. Procedural Background

Plaintiff filed the Complaint in November 2011, alleging that Defendant terminated her

employment in retaliation for her final FMLA leave in October 2010.  <u>See generally</u> Compl.[4]

Defendant answered, discovery was conducted, and Defendant filed the Motion and an

accompanying Memorandum of law in December 2012.  <u>See</u> Dkt. Nos. 9 ("Answer"); 10-11; 23-27

("Memorandum"); Mot.  Plaintiff responded and Defendant replied.  <u>See</u> Dkt. Nos. 26 through 26-

23; 28 through 28-12.

## III. LEGAL STANDARD

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment

if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  F<small>ED</small>. R. C<small>IV</small>. P. 56(c).  Although "[f]actual disputes that are irrelevant or

unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v.

Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Taggart v. Time, Inc.</u>, 924 F.2d 43, 46 (2d

Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis

---

[4] The Second Circuit recognizes two distinct FMLA claims: interference and retaliation.  <u>See</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 16, 175 (2d Cir. 2006).  The Complaint did not specify whether Plaintiff was bringing an interference claim, a retaliation claim, or both.  <u>See</u> Compl. ¶¶ 23-26.  Defendant argued that Plaintiff could not bring an interference claim because she was not denied rights to which she was entitled under the FMLA: she had received all of her requested leave when she was terminated.  <u>See</u> Dkt. No. 23-27 ("Memorandum") at 21-23.  Plaintiff's response clearly indicates that she is bringing only an FMLA retaliation claim.  <u>See generally</u> Dkt. No. 26-22 ("Response Memorandum").

for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows that there is no genuine dispute as to any material fact, the burden shifts to the nonmoving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. FMLA Retaliation

The FMLA entitles eligible employees to twelve weeks of annual leave for qualifying health or family obligations. See Sista, 445 F.3d at 174; 29 U.S.C. § 2612(a)(1)(d). An employer may not terminate or otherwise retaliate against an employee for taking such leave. See Potenza v. City of New York, 365 F.3d 165, 167-68 (2d Cir. 2004); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave."). Prohibited retaliation occurs where the employee's FMLA leave is "at least one motivating factor" in the employer's termination decision. Benimovich v. Fieldston Operating LLC, No. 11 Civ. 780, 2013 WL 1189480, at *6 (S.D.N.Y. Mar. 22, 2013).

FMLA retaliation claims proceed according to the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Greene, 411 U.S. 792 (1973). See Sista, 445 F.3d at 175-76; Potenza, 365 F.3d at 167; A plaintiff must first make out a prima facie case by establishing that: (1) "[s]he exercised rights protected under the FMLA"; (2) "[s]he was qualified for h[er] position"; (3) "[s]he suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza, 365 F.3d at 169. The plaintiff's burden in making out a prima facie case is de minimis. Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012); see also Benimovich, 2013 WL 1189480, at *5 (describing the prima facie burden as "minimal"). If the plaintiff can meet this minimal burden, the employer must offer "clear and specific" non-retaliatory reasons for the adverse action. Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985). "[O]nce a minimal prima facie case is proved and the employer's non[-retaliatory] explanation has been given, the McDonnell Douglas presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited [retaliation] occurred." James v. N.Y. Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000). A court may examine the "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." Id. (alterations in original) (quoting Reeves, 530 U.S. 133 at 148-49). "To defeat summary judgment, plaintiff need not show that defendant's proffered reason was false or played no role in the decision to terminate h[er], but only that it was not the only reason, and that h[er] filing for FMLA leave was at least one motivating factor." Nagel Debell v. Maimonides Med. Ctr., No. 09-CV-3491, 2011 WL 4710818, at *10 (E.D.N.Y. Sept. 30, 2011).

## IV.  DISCUSSION

### A.  Prima Facie Case

Defendant does not dispute that Plaintiff has offered sufficient evidence to meet the first three elements of the prima facie case but argues that the circumstances of Plaintiff's termination do not give rise to an inference of retaliation.  See Mem. at 9-10.  Plaintiff argues that a retaliation inference arises from: (1) the close temporal proximity—less than a single day—between her return from FMLA and her termination; and (2) Westphal's history of expressing animus towards her FMLA leave.  See Resp. Mem. at 12-14.

### 1.  Temporal Proximity.

Plaintiff was terminated on the day she returned from FMLA leave.  Such close temporal proximity generally gives rise to an inference of retaliation.  See Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 152 (2d Cir. 2012) (denying summary judgment based on the "'very close'" proximity—ten days—between plaintiff's return from FMLA leave and defendant's negative evaluation of his performance.); DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) ("Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment."); Mazurkiewicz v. N.Y.C. Health & Hosps. Corp., No. 09 Civ. 5962, 2010 WL 3958852, at *5 (S.D.N.Y. Sept. 16, 2010) (noting that a gap of less than two months between protected activity and an adverse action generally gives rise to an inference of causation).

Defendant argues that the temporal-proximity inference is inapplicable because Plaintiff was "subjected to discipline such that her job was already in jeopardy" before taking FMLA leave. Mem. at 9.  Prior discipline can negate the temporal-proximity inference.  See Slattery v. Swiss

Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). But as the cases cited by Defendant demonstrate, the temporal-proximity inference is not negated here. In Roberts v. Health Ass'n, 308 F. App'x 568, 570 (2d Cir. 2009), the plaintiff, who was fired six days after requesting FMLA leave, had been informed shortly before her request that her job was "in jeopardy" if she did not take a specific action: providing evidence of her disability to her employer's insurance carriers. In Fischer v. NYC Dep't of Educ., 666 F. Supp.2d 309, 318-319 (E.D.N.Y. 2009), the plaintiff, who relied "principally" on a temporal gap of between three weeks and four months, had been subjected to "two years of progressive discipline for a variety of infractions" before the protected activity at issue.

In this case, Plaintiff, other than an uneffectuated and immediately withdrawn threat of termination for a single incident more than a year before her termination, had never been threatened with termination or specific discipline of any kind, and had certainly never been told prior to her leave that her termination was probable or imminent. Indeed, the only arguably formal discipline Plaintiff had received before her termination were two verbal warnings in 2008, which Plaintiff argues constituted only "conversations" between her and Westphal. SMF ¶¶ 19-20; SMF Resp. ¶¶ 19-20; March 2008 Counseling Notice; October 2008 Counseling Notice. While Plaintiff may well have been chastised on other occasions, this is not a case like Roberts where the plaintiff had already been told before her protected activity that she had to take a specific action to avoid termination, or a case like Fischer where a series of formal, increasing disciplinary actions had indisputably placed the plaintiff on the verge of termination. The pre-leave prospect of Plaintiff's

9

termination was simply too remote to negate the temporal-proximity inference. This is especially so because the temporal gap between protected activity and adverse action in this case—zero days—is far shorter than in the cases cited by Defendant. And even if the temporal-proximity inference were negated by Plaintiff's alleged misconduct, Plaintiff, unlike the plaintiffs in those cases, also offers a strong non-temporal-proximity basis for an inference of retaliation: Westphal's history of expressing hostility towards Plaintiff's leaves. See Slattery, 248 F.3d at 95 (noting that prior discipline may negate an inference of retaliation where "timing is the *only* basis for a claim of retaliation") (emphasis added).

### 2. Westphal's Expressed Hostility Towards Plaintiff's Leave

Employer comments or actions evincing animus towards FMLA leave can create an inference of retaliation. See Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (finding prima facie case met based on evidence that supervisor treated plaintiff in an "unfriendly way" after her return from FMLA leave); Cooper v. N.Y.S. Nurses Ass'n, 847 F. Supp. 2d 437, 443 (E.D.N.Y. 2012) (denying summary judgment where supervisor's comment could be construed as describing plaintiff's FMLA leave as "not good for the team"); Esser v. Rainbow Adver. Sales Corp., 448 F. Supp. 2d 574, 581-82 (S.D.N.Y. 2006) (finding inference of causation where supervisor appeared irritated regarding FMLA leave).

Plaintiff points to a number of instances in which Westphal expressed his hostility towards her leave. See Resp. Mem. at 12-14. Defendant contends that: (1) Westphal complained about Plaintiff's failure to provide documentation and notification regarding her leaves, not the leaves themselves; and (2) even if Westphal did express animosity towards Plaintiff's leave, he did so long before that October 2010 FMLA leave that Plaintiff alleges motivated his decision to terminate her.

See Mem. at 12-14.

Defendant correctly notes that some of Plaintiff's supposedly animus-evincing evidence refers only to the manner in which Plaintiff requested and notified Defendant regarding leave, not leave itself. The March 2008 Counseling Notice's discussion of time-sheet accuracy and employees' non-entitlement to compensatory time does not evince hostility towards FMLA leave. Neither, on its face, does its reference to Plaintiff's obligation to "notify [Westphal] about illness and time off." March 2008 Counseling Notice. However, Plaintiff has alleged that she always notified Defendant about foreseeable absences and that, when she had to miss work because of an unforeseen illness, she immediately contacted Westphal. See SMF Resp. ¶¶ 19-20.[5] The March 2008 Counseling Notice could thus be read to be expressing hostility towards those illness-caused leaves for which Plaintiff could not provide advance notice.[6]

The record also contains less ambiguous manifestations of Westphal's leave-based animus. In the only performance evaluation Plaintiff received, Westphal gave Plaintiff a 2 out of 5 in the "dependability" category—her lowest category score—and noted that "[w]hen present [Plaintiff is] dependable." Dkt. No. 26-3 ("Performance Evaluation"). Even if Plaintiff was remiss about

---

[5] Whether Plaintiff actually provided such notice is a disputed question of fact unsuitable for resolution on summary judgment. See Dupee v. Klaff's, Inc., 462 F. Supp. 2d 233, 241 (D. Conn. 2006).

[6] As noted *supra*, Defendant admits that many of Plaintiff's leaves were FMLA leaves. Plaintiff argues that only a few leaves were actually treated by Defendant as FMLA leaves. Both parties agree, however, that many of Plaintiff's leaves were for illness. Thus, even if the leaves were not officially treated as FMLA leave by Defendant, Westphal's attitude towards those leaves bears upon his attitude towards Plaintiff's October 2010 FMLA leave; an employer who is angry that a employee has taken sick leave is unlikely to feel differently regarding sick leave that is officially labeled "FMLA leave." Cf. Wanamaker v. Westport Bd. of Educ., 899 F. Supp. 2d 193, 198 (D. Conn. 2012) (finding inference of FMLA retaliation where plaintiff alleged that, prior to her leave, supervisor had "displayed hostility and illegal animus toward teacher absences, regardless of whether the absences were *health-related or otherwise legitimate*" (emphasis added)).

providing notice regarding her absences, this statement could plausibly be read as a reference to the leave itself, not the manner in which it was taken. And an employer who labels an employee "undependable" for taking sick leave has evinced animosity towards that leave.

The Examination Letter further demonstrates Westphal's leave-based animus: Westphal notes that Plaintiff had been "absent from work for periods of time dating back to November 2009," that her attendance "had not improved," and that her "[s]ignificant use of sick time suggest[ed] diminished performance." Examination Letter. Again, expressing dissatisfaction with an employee's sick leave, and contending that the use of sick leave is inherently suggestive of diminished performance, may reasonably be deemed to evince leave-based animus.

Plaintiff also points to Westphal's informal, undocumented comments and conduct: she alleges that he complained about her illness-caused absences, that he seemed annoyed every time she returned from an absence, and that he placed "see me" notes on her desk following every absence but, when she attempted to meet with him as requested, he would not meet with her. Dkt. No. 26 ("Terry Affidavit") ¶¶ 9-10. She also alleges that Westphal always gave her the "cold shoulder" or the "silent treatment" following her absences. Id. Defendant argues that Plaintiff has presented no "proof that [Westphal] ever made any comment directed toward her use of FMLA leave" and that his comments and conduct may have been directed instead towards Plaintiff's non-FMLA-covered "oversleeping, failing to call in when she was going to be late, and the like." Mem. at 14. But, as discussed *supra,* Defendant admits that many of Plaintiff's leaves qualified as FMLA leave and that Plaintiff took a number of leaves for illnesses. Moreover, Plaintiff alleges that: (1) Westphal expressed annoyance *every time* she returned from leave; and (2) she provided advance notice of every non-illness-related absence and immediate notice of any illness-related absence. A

12

reasonable factfinder could therefore determine that some of Westphal's alleged expressions of displeasure were responsive to Plaintiff's leave itself.[7]  While Defendant correctly notes that a "supervisor can—and indeed must—monitor an employee's attendance issues, and bring to the employees's attention any such issues to obtain correction," whether Westphal's conduct and comments constituted the dispassionate "monitoring" of Plaintiff's leave or evinced hostility towards that leave is a disputed question of fact unsuitable for resolution on summary judgment.

Finally, Defendant also argues that, even if Westphal did express hostility towards Plaintiff's leave, such expressions were "stray remarks" made too long before his termination decision to give rise to an inference of retaliation.  Dkt. No. 28-8 ("Reply Memorandum").  But the case cited by Defendant for this proposition, Bobo v. Wachovia Securities, L.L.C., No. 107-CV-01056 , 2010 WL 1186455, at *8  (N.D.N.Y. Mar. 23, 2010), held only that "stray remarks, '*without more*, cannot get a discrimination suit to a jury.'"  Id. (emphasis added) (quoting Danzer v. Norden Sys., 151 F.3d 50, 56 (2d Cir. 1998)).[8]  As the Second Circuit has noted, "[i]f it were otherwise, disparaged workers

---

[7] Defendant also argues that Plaintiff has failed to specify what Westphal said to Plaintiff following her leaves.  See Mem. at 14.  While Plaintiff's descriptions of Westphal's statements are vague, she has described specific conduct that a reasonable factfinder could find indicated irritation towards Plaintiff's sick leave.  See Esser, 448 F. Supp. 2d at 581-82 (finding inference of causation where Plaintiff alleged that his supervisor appeared irritated regarding FMLA leave and noting that whether the supervisor "was in fact irritated . . . and whether that irritation indicates animus toward plaintiff for taking FMLA leave are issues of fact improper for summary judgment"); see also Wanamaker, 899 F. Supp. 2d at 198 (finding inference of FMLA retaliation where plaintiff alleged that, prior to her leave, supervisor had displayed "hostility" toward absences.).

[8] Defendant also cites Justice O'Connor's concurring opinion in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), for the proposition that "'[s]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself' are insufficient to establish retaliatory intent." Mem. at 12 (quoting Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring)).  The cited passage referred to the direct-evidence burden a plaintiff has to meet in order to shift the burden of persuasion onto the employer in "mixed-motive" cases.  It does not speak to Plaintiff's burden in this case, where she has not offered direct evidence and is not proceeding according to a mixed-motive burden-shifting framework.

13

who had the 'fortuity' of being in the class encompassed by the stray remark would have an instantaneous jury case on discrimination, regardless of the ground for their dismissal." <u>Danzer</u>, 151 F.3d at 56. In this case, however, rather than pointing merely to a single "stray" comment by Westphal expressing hostility towards FMLA leave in general, Plaintiff has offered: (1) evidence of Westphal's long history of comments and conduct evincing animus directed at *her* FMLA leave; and (2) temporal-proximity evidence of retaliation. As "other indicia of discrimination are properly presented, [Westphal']s remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." <u>Id.</u>

Plaintiff's temporal-proximity and leave-hostility evidence is therefore sufficient to make out a prima facie case of FMLA retaliation.

### B. Pretext

Defendant has offered a number of Plaintiff's performance deficiencies as its non-retaliatory termination reason: (1) Plaintiff's excessive personal phone calls and texts, as reported to Westphal by Helas shortly before Plaintiff's termination; (2) Plaintiff's poor work performance, as reported to Westphal by Gould shortly before Plaintiff's termination; (3) Plaintiff's poor organization of, and insufficient documentation in, her case files, as discovered in Westphal's review of those files shortly before Plaintiff's termination; (4) Plaintiff's failure to file a motion for a default judgment in one case or proof of service in another, as well as her one-year delay in taking action in a third case, as discovered in Westphal's case-file review; and (5) Plaintiff's failure to read or respond to emails sent to her County Account as discovered by Westphal when he accessed that account shortly before Plaintiff's termination. <u>See</u> Mem. at 16-17; Reply Mem. at 2-5. Plaintiff contends that none of

these alleged deficiencies actually motivated Westphal's decision to terminate her.  <u>See generally</u> Resp. Mem.

### 1. *Phone Usage*

Defendant argues that Westphal terminated Plaintiff in part because of his receipt of Helas's report, shortly before Plaintiff's termination, that Plaintiff was "spending excessive time using her cell phone for personal phone calls and texts during work hours."  Mem. at 16.  Defendant has submitted an affidavit from Helas to this effect and claims that "[t]here is no record evidence to suggest that . . . the information was manufactured."  Mem. at 16; Dkt. No. 23-26 ("Helas Affidavit").  This is not so.  Helas's affidavit indicates that, from 2007 on, she observed Plaintiff using her cellular phone to make personal calls and texts for an average of five hours a day.  Helas Aff.  Helas also states that, at some unspecified time "earlier than" September 2010, and possibly as early as 2007, Westphal asked her to monitor employees' telephone usage.  <u>Id.</u> ¶ 5.  Yet despite witnessing a co-worker spending nearly 70% of her working hours using the phone for personal purposes, Helas asserts that she waited nearly three years to inform her direct supervisor of that usage—even though, for some unspecifed portion of those three years, Helas was under explicit instructions by that direct supervisor to monitor employees' phone usage.  A reasonable factfinder could find Helas's report incredible and determine that, if Plaintiff's phone usage was as asserted, Helas would have informed Westphal long before September 2010 and Westphal would have taken substantial and immediate disciplinary action against Plaintiff.  The evidence of pretext is strengthened by phone records offered by Plaintiff showing that the aggregate workday personal calls on both her cellular and work phone were of minimal duration.  <u>See</u> Dkt. Nos. 26-8; 26-9; Terry Aff. ¶¶ 25, 28.  While Defendant tries to rebut this evidence by noting that the records do not

include text messages, Helas's affidavit does not indicate that Plaintiff's texting time far exceeded her calling time, and thus Plaintiff's limited calling time plausibly suggests that her total calling and texting time may have been far less than the five hours asserted by Helas. See Reply Mem. at 5 n.24; Helas Aff.

Defendant correctly argues that: (1) Plaintiff has offered no reason for Helas to make a false report about Plaintiff's phone usage to Westphal; and (2) even if Helas lied to Westphal, the phone-usage termination reason would not be pretextual if Westphal believed Helas. See Reply Mem. at 6. But a reasonable factfinder could determine that Helas is being untruthful now, i.e., that she did not actually witness Plaintiff making five hours a day of calls and texts nor did she make such a report to Westphal. As Defendant acknowledges, Helas was Westphal's long-time confidential secretary and someone with whom he was close enough to entrust with monitoring other employees. SMF ¶¶ 52-53. Plaintiff also alleges that Helas and Westphal were neighbors, that their respective families socialized, and that Westphal had repeatedly favored Helas by creating three special positions for her that were not subject to New York Civil Service Law competitive appointment procedures. Terry Aff. ¶ 23. Because a reasonable factfinder could plausibly find, as discussed *supra*, that Helas did not actually witness excessive phone usage by Plaintiff, a reasonable factfinder could also wonder whether Helas is now asserting that she that she reported such usage to Westphal so as to aid her friend and former boss. See Benimovich, 2013 WL 1189480, at *4-5 (denying summary judgment on FMLA claims where Plaintiff argued that "familial and personal relationships" between supervisor and other employees cast doubt on the credibility of their testimony).

## 2. *Gould Report*

Defendant also offers Gould's complaint about Plaintiff's performance "just prior" to the termination decision as a reason for that termination. Mem. at 16. Again, there is a temporal basis upon which to reasonably question this termination explanation. Gould, in her affidavit, notes that she began working with Plaintiff in 2004 and that she found Plaintiff to be "prone to unwarranted delays in handling simple matters, disorganized, unreliable, and to have a tendency to provide nonresponsive answers to straightforward requests." Dkt. No. 23-25 ("Gould Affidavit") ¶ 3. She also notes that she "expressed these concerns" to Westphal "over the years." Id. ¶ 4. Yet despite Gould's alleged reporting of Plaintiff's poor performance to Westphal "over the years," Westphal apparently took no formal disciplinary action nor even spoke to Plaintiff about the concerns raised by Gould. Neither the Performance Evaluation nor Plaintiff's two memorialized verbal warnings speak to the specific concerns Gould allegedly raised. While the Examination Letter does mention Plaintiff's "ability to adequately perform assigned tasks," it does so only in the context of Plaintiff's work involving "children services issues," work with which Gould, a supervisor in the County Medicaid Department, likely would not have been involved and thus about which she would not have complained. Examination Letter. The Examination Letter also makes no mention of Plaintiff's alleged delays, disorganization, and non-responsive answers in any context. See id.

However, Defendant argues that it terminated Plaintiff only for Gould's late-2010 report to Westphal. Prior discipline or documentation regarding this report was therefore impossible. Nevertheless, the substance of Gould's 2010 report was similar to the substance of her earlier reports. See Gould Aff. ¶¶ 3, 5-8. A reasonable factfinder could thus determine that, if Westphal did not believe that those earlier complaints called for any discipline or documentation whatsoever, he did not believe that the latter complaint called for Plaintiff's termination. Cf. Zimmerman v.

17

Assocs. First Capital Corp., 251 F.3d 376, 379 (2d Cir. 2001) (finding notable the employer's failure to "offer a single item of documentary evidence to support its assertion that it fired [employee] for inferior performance"); Benimovich, 2013 WL 1189480, at *5-6 (finding pretext where plaintiff was spoken to once or twice about putative termination-causing conduct but was never disciplined for it); Klings v. N.Y.S. Office of Court Admin., No. 04-CV-3400, 2010 WL 1292256, at *14-15 (E.D.N.Y. Apr. 5, 2010) (finding sufficient evidence of pretext where performance criticisms of plaintiff had not been documented). Similarly, a factfinder could reasonably believe that, if Gould had actually made her earlier reports as she now claims, Westphal would have documented those reports or disciplined Plaintiff. This belief could legitimately support further doubt as to whether Gould actually made the late-2010 report to Westphal. Plaintiff has therefore offered some evidence that this termination reason is pretextual.

### 3. State of Plaintiff's Case Files

Defendant contends that Westphal's review of Plaintiff's files during her absence indicated that Plaintiff's files were disorganized and did not indicate what work had been, or needed to be, done. See Mem. at 17. Plaintiff argues that Defendant had no standard file-organization procedure and she therefore used her own organizational system, that her files provided "a procedural history of what was occurring," and that Westphal could have called her with questions regarding the status of her cases. SMF Resp. ¶¶ 59-60; Terry Aff. ¶ 42. As with Defendant's other termination explanations, Westphal's failure to raise this issue previously is suggestive of pretext. Plaintiff had been out of work for extended periods of time before her termination, absences that presumably required Westphal or other attorneys to use and review Plaintiff's files. Yet Plaintiff was never disciplined for, or counseled regarding, her filing system. Moreover, a copy of one of Plaintiff's

case files offered by Defendant does seem to demonstrate, in a relatively easy-to-follow chronological manner, what work Plaintiff had performed.[9] See Dkt. No 28-3 ("Jane Case File"). There is thus some basis upon which to doubt the case-file termination explanation.[10]

### 4. Handling of Three Cases

According to Defendant, Westphal's review of Plaintiff's case files revealed that Plaintiff had failed to file for a default judgment in one case, had failed to file proof of service for an amended complaint in another, and had delayed nearly a year in taking any action in a third case. See Mem. at 17.

### a. Default Judgment

Regarding the default-judgment case, Plaintiff argues that information provided by the defendant's attorney in that case indicated that the County's lawsuit was meritless, and therefore that filing a motion for a default judgment would have been "highly improper." Terry Aff. ¶ 39. Defendant responds that, whatever the validity of Plaintiff's decision, the case file as reviewed by Westphal contained nothing suggesting that filing a motion for a default judgment would be improper. See Mem. at 17 n.39; Dkt. No. 28 ("Reply Affidavit") ¶ 61. Yet the case file suggests otherwise. Terry filed a complaint on May 28, 2010, seeking contribution from the defendant

---

[9] Defendant argues that, because Plaintiff has offered an explanation to the Court of the documents in the file and what they reflect, she has effectively admitted that her files were inadequate. See Reply Mem. at 4. But Plaintiff's explanation of her files to an entity entirely unfamiliar with her cases or clients and not permitted to engage in *ex parte* communication is not dispositive as to whether Westphal believed those files conveyed sufficient information to Plaintiff's co-workers.

[10] Of course, if Westphal genuinely believed Plaintiff's filing system was inadequate, the objective adequacy of the system would be irrelevant. However, the objective adequacy of the system bears upon whether Westphal's belief was genuine.

towards costs paid by Medicaid for his wife's care.  See Jane Case File at 1-5.[11]  A letter from the defendant's counsel two months later indicated that he and Terry had already been exchanging information and that Terry had granted him an extension to file an answer.  Id. at 6.  The letter also provided information regarding the defendant's ownership interest in a certain property, information that the defendant's counsel argued demonstrated that the defendant did not have sufficient resources to be liable for his wife's medical costs.  Id.  Terry responded seeking additional information and expressing her willingness, based on that information, to provide a further extension for filing the answer, provided that the defendant's counsel agreed to show the County similar consideration regarding future deadlines.  Id. at 7.  The requested information was provided by the defendant's counsel, who also offered his interpretation of that information.  Id. at 8.  Terry responded ten days later, on August 20, 2010, stating that she agreed with the defendant's counsel's interpretation and instructing him to "[p]lease submit your answer and will go from there."  Id. at 9.

Defendant argues that this last instruction unambiguously demonstrates that Terry should have filed a motion for a default judgment when no answer was subsequently filed.  Reply Aff. ¶ 61.  But the correspondence contained in the Jane Case File reveals that the defendant's counsel had made credible arguments regarding the substantive invalidity of the County's claim and that Terry found those arguments to have some merit.  The correspondence also indicates an ongoing, productive exchange of information between Terry and the defendant's counsel.  The "will go from there" language plausibly suggests that, while the defendant was to file his answer, negotiations and the informal exchange of information were to continue.  A reasonable factfinder could determine that, given the recognized validity of the defendant's arguments, the tenor of prior negotiations, and

---

[11]  The pagination corresponds to the page numbers assigned by ECF.

the contemplation of future negotiations, Westphal's contention that a default-judgment motion "was clearly called for" is not credible. This is particularly so in light of the commencement of Plaintiff's pre-termination medical leave less than six weeks' after her final letter to the defendant's counsel—filing a motion for a default judgment relatively soon after the aforementioned communications might well be deemed sharp practice. Moreover, a reasonable factfinder could also wonder why, if Westphal was concerned with ensuring that Plaintiff's cases were properly handled while she was on leave, <u>see</u> Dkt. No. 23-21 ("Westphal Affidavit") ¶ 34 ("I wished to ensure the matters Plaintiff was handling would continue to be monitored (and, as necessary, handled) during her absence"), he did not call her to ask what steps she had taken recently in this case and why she had not filed a motion for a default judgment.[12]

### b. Proof of Service

Regarding the case in which Plaintiff failed to file proof of service of an amended complaint, Plaintiff argues that she had obtained an acknowledgment of service and therefore an affidavit of service was unnecessary. SMF ¶ 63; SMF Resp. ¶ 63 . Defendant correctly notes that this is non-responsive: Westphal allegedly took issue with Plaintiff failure to file proof of service with the court, not the form of the proof of service Plaintiff obtained. <u>See</u> Reply Mem. at 5; SMF ¶ 63. But

---

[12] In the Reply Affidavit, Defendant also points to, and provides a copy of, a case file from another case that Defendant claims shows that Plaintiff should have sought a default judgment in that other case. <u>See</u> Reply Aff. ¶ 61; Dkt. No. 28-1. However, Defendant acknowledges that this other case file was not the case file to which Defendant referred in the SMF. <u>See</u> Reply Aff. ¶ 61; <u>see also</u> SMF ¶ 61 ("Westphal's review of *one file* indicated Plaintiff had not filed a motion for default judgment although one was clearly called for") (emphasis added); Dkt. No. 23-21 ("Westphal Affidavit") ¶ 36 ("My review of *one file* indicated Plaintiff had not filed a motion for default judgment although one was clearly called for") (emphasis added). As Defendant did not offer this other case file as a reason for Westphal's termination decision, and does not even argue that Westphal saw this other case file prior to Plaintiff's termination, Defendant cannot offer it as a non-retaliatory reason for Plaintiff's termination. <u>See</u> Reply Aff. ¶ 61.

Defendant errs in asserting that "[o]f course, proof of service must be filed with the court" and that "Plaintiff can hardly argue otherwise."  Reply Mem. at 5.  In state court, the general rule is that proof of service need not be filed.  See Vincent C. Alexander, PRACTICE COMMENTARIES, C306-b:2, reprinted in 7B McKinney's Consolidated Laws of New York (2012) (noting that a 1998 amendment to N.Y. C.P.L.R. § 306-b "restored the general rule that filing proof of service is not required as a condition to valid commencement of an action").  While the filing of proof of service is required to complete some types of service and thereby commence the time for a defendant to answer, proof of service need not be filed where, as appears to be the case in the case at issue here, the defendant is personally served.  Compare C.P.L.R. § 308(1), with id. § 308(2); see SMF ¶ 63; Dkt. No. 26-16.  And while proof of service must be filed in response to a motion to dismiss for improper service, In re CACV of Colorado, LLC, 887 N.Y.S.2d 897, 897 (App. Div. 2009), Defendant does not contend that the County was facing such a motion.  Nor does Defendant offer any specific basis for its contention that proof of service should have been filed in the case at issue. Of course, if Westphal genuinely believed, as he testified at his deposition, that filing of proof of service is "an absolute requirement under the CPLR," whether such a requirement actually existed would be irrelevant.  Dkt. No. 26-19 ("Westphal Deposition") at 3.[13]  Nevertheless, a reasonable factfinder could determine that Westphal, as an experienced attorney, knew that the filing of proof of service was not required.  Moreover, a reasonable factfinder could also wonder why Westphal, if he was concerned with ensuring that Plaintiff's cases were handled in her absence, did not call her to ask if she had filed proof of service and, if she had not, why she had not done so.

### c.  One-Year Failure to Take Action

---

[13] The pagination corresponds to the page numbers assigned by ECF.

Westphal allegedly determined, based on a review of another case file, that Plaintiff had

delayed taking any action for more than a year after the case was assigned to her.  SMF ¶¶ 47, 62.

Defendant asserts that Plaintiff assumed responsibility for the case in June 2008 and did not file a

complaint until January 2010.  Reply Aff. ¶ 62.  However, Plaintiff's 2008 assumption of

responsibility is premised on a June 11, 2009, memorandum from Gould, which Gould describes as

a "follow-up" to a June 2008 memorandum sent to Plaintiff from another employee.  See Dkt. No.

26-11 ("Gould Memorandum"); Reply Aff. ¶ 62.  On the Gould Memorandum, however, Plaintiff

handwrote a note to Westphal explaining that she had previously received only a "heads-up" that the

case would be sent to her in the future.  Gould Mem.  Plaintiff's contention that she had not been

given responsibility for the case until receiving the Gould Memorandum is buttressed by a case

referral form dated July 13, 2009—it would be unusual if Defendant provided case referral forms to

attorneys more than a year after cases had actually been assigned to those attorneys.  See Dkt. No.

26-12.  Thus, a reasonable factfinder could determine that Westphal knew that Plaintiff had not

received the case assignment until mid-2009, and thus, rather than waiting a year and a half to file a

complaint, she waited a mere six months.  Plaintiff alleges that she did not even wait six months to

take any action on this case but commenced negotiations with opposing counsel soon after the case

was forwarded to her, negotiations she claims are evidenced by a worksheet in the case file.  Terry

Aff. ¶ 36; SMF Resp. ¶ 62; Dkt. No. 26-13 ("Worksheet").  Defendant correctly notes, however,

that none of the Worksheet's calculations appear to have been performed prior to the filing of the

complaint.  See Reply Mem. at 4; Worksheet.  Thus, while there is no documentary basis for a

reasonable factfinder to doubt that Westphal believed that Plaintiff had delayed taking action, there

is a basis for determining that the perceived delay was significantly less lengthy than Westphal now

claims.

### 3. Email

Defendant also offers Plaintiff's failure to check her County Account and respond to emails sent to that account as a reason for her termination. Mem. at 17. Plaintiff asserts that she was told by IT personnel that she did not have "legal access" to the county account because of "New York HIP[A]A Regulations" and therefore should not use it. SMF Resp. ¶¶ 64-65; Terry Aff. ¶ 40. Plaintiff submits an affidavit from Steve Johnson, the Cayuga County Director of Information Technology, who states that under "New York State Health Department HIP[A]A Regulations" all County Health and Human Services employees were required to use only their state, rather than county, email addresses for "any health or Human Services related cases or business." Dkt No. 26-17 ("Johnson Affidavit"). He also affirms that Plaintiff was a "Health/Social Services employee" to whom this requirement applied. Id. Finally, he states that it was "standard County operating procedure to let any employee with a [state] email address utilize . . . [that] account for all [s]tate and County related business." Id.

Defendant responds that Plaintiff's email-access argument is premised on her pre-2009 position as an employee assigned to the Social Services Department, and therefore that she would have had access to her County Account after her position was transferred to the County Attorney's Office. Reply Mem. at 3. But, as Plaintiff was still performing the same work after that transfer, it is plausible that the putatively applicable HIPAA Regulations still applied to Plaintiff, or at least that Plaintiff and Westphal believed they did. Defendant has offered no evidence that these regulations were automatically inapplicable to formal employees of the County Attorney.

Defendant also argues that Westphal's ability to access Plaintiff's County Account from her

24

computer demonstrates that Plaintiff had access to that account. <u>See</u> Mem. at 17. But, as discussed *supra*, Plaintiff has offered evidence that, regardless of whether she was technically "able" to access the account, she was not permitted to do so. Moreover, even if Plaintiff was permitted to access her account, Johnson affirms that it was the County's standard operating procedure to let any employee with a state email account utilize that account exclusively. Terminating Plaintiff for following Defendant's standard procedure suggests pretext. <u>Cf.</u> <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1226-27 (2d Cir. 1994) (finding sufficient evidence of discriminatory intent where employer's treatment of plaintiff violated its own policy); <u>Bonura v. Chase Manhattan Bank, N.A.</u>, 795 F.2d 276, 277 (2d Cir. 1986) (same).

Plaintiff further alleges that Westphal explicitly told her that he knew she could not access her County Account and that she should not worry about being unable to do so. SMF Resp. ¶ 22, 26; Terry Aff. ¶ 15. Defendant asserts that it is "incredible" that Westphal gave such an instruction. Mem. at 17. But, in light of the evidence regarding HIPAA requirements and Defendant's standard email policy, a reasonable factfinder could credit Plaintiff's account. Defendant argues, however, that whether Westphal actually made such a statement is irrelevant, because he "certainly did not *recall* giving her such a direction" and that "[i]t is undisputed that at the time . . . Westphal terminated Plaintiff, he believed there was no excuse for her failure to review the e-mail account." <u>Id.</u> Defendant is correct that if, at the time he terminated Plaintiff, Westphal did not remember permitting her to ignore her County Account and genuinely believed her failure to check that account was inexcusable, then Plaintiff could not demonstrate pretext. But Defendant errs in arguing that Westphal's forgetfulness and belief are "certain[]" or "undisputed." <u>Id.</u> Westphal's affidavit is not dispositive as to his memory or belief. Particularly in light of evidence regarding the

putatively applicable regulations and Defendant's standard policy, a reasonable factfinder could determine that Westphal remembered permitting Plaintiff to ignore her County Account and therefore did not believe, at the time he terminated her employment, that her doing so was improper.

Plaintiff also alleges that, even if Westphal believed that Plaintiff's failure to open her County Account emails was improper, he did not actually check her County Account until *after* he terminated her and therefore cannot have relied on her failure to open emails in deciding to terminate her. SMF Resp. ¶ 65. She provides an expert affidavit noting that, although email records provided by Defendant show that Westphal read and responded to Plaintiff's emails after Plaintiff's termination, there is "no evidence" that Westphal examined Plaintiff's County Account prior to October 18, 2010—five days after Plaintiff had been terminated. Dkt. No. 26-20 ("Frost Affidavit"). Defendant admits that Westphal did not open or respond to emails before Plaintiff's termination but claims that he did log into her County Account and note from the inbox screen that her emails were unopened. Reply Aff. ¶ 58. Defendant asserts that such an examination would leave no trace and provides an expert affidavit to this effect. See id.; Dkt. No. 28-6 ("Clary Affidavit"). Plaintiff has offered no evidence refuting this contention. Nevertheless, there is a non-technical basis upon which to reasonably doubt Westphal's pre-termination review of the County Account. Westphal asserts that he accessed the County Account seven to ten days before he terminated Plaintiff. Reply Aff. ¶ 58; Westphal Aff. ¶¶ 39, 41. Yet despite: (1) finding that Plaintiff had not opened any email; (2) his alleged belief that unopening of the emails was a serious offense; and (3) his alleged desire, discussed *infra*, to ensure that Plaintiff's cases were adequately handled in her absence, Westphal waited approximately two weeks to open or respond to a single one of Plaintiff's emails. A reasonable factfinder could disbelieve this version of events and determine

that, had Westphal discovered Plaintiff's failure to respond, and had that failure to respond been as grave as he now claims, he would have immediately opened Plaintiff's emails to determine whether any required immediate attention and would have responded to such emails promptly.

### C. Other Evidence

#### 1. Plaintiff's Additional Evidence

Plaintiff has offered an additional piece of evidence suggesting that all of Defendant's stated performance-based termination explanations are pretextual: Westphal's admitted failure to tell Plaintiff when he terminated her that he doing so for performance reasons. See SMF ¶¶ 67-68; Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 634 (7th Cir. 1996) (upholding jury finding of pretext where supervisor, when asked by plaintiff for explanation of the adverse action, did not provide explanation subsequently offered at trial). Defendant correctly notes that Westphal's stated termination explanation, his and Plaintiff's failure to see "eye to eye" for a "long time," might reasonably be interpreted to constitute an implicit reference to performance issues. SMF ¶ 68. And Plaintiff's failure to seek clarification from Westphal might suggest that she understood that Westphal was referring to her performance. See SMF ¶ 69. But another plausible reading of Westphal's statement is that he was referring to Plaintiff's taking of FMLA leave, or, at the very least, that he was not referring to Plaintiff's performance. A reasonable factfinder could therefore determine that the manner of Plaintiff's termination suggests pretext or evinces retaliatory animus.

#### 2. Defendant's Additional Evidence

Defendant argues that Westphal's non-retaliation against Helas, his previous non-retaliation against Plaintiff for prior FMLA leaves, and his granting of Plaintiff's FMLA-leave requests

demonstrates his lack of retaliatory animus. <u>See</u> Mem. at 18-19. But, as discussed *supra*, Helas and Westphal had a close personal relationship, which lessens the probative value of his non-retaliation.[14] While Defendant's non-retaliation against Helas weighs against a finding of retaliation, it does not do so strongly.

The same is true regarding Westphal's continued re-appointment of Plaintiff, including a 2010 re-appointment, despite her taking of FMLA leave. Defendant argues that the same-actor inference applies strongly here: if Westphal harbored retaliatory animus, he would not have re-appointed Plaintiff after she had taken extensive leave. <u>See</u> Mem. at 19. But Plaintiff had never, until shortly before her termination, requested and received approval for intermittent FMLA leave. It was therefore not until after Westphal's last re-appointment of Plaintiff that, for the first time, she combined a long period of leave and the prospect of regular future leave. Moreover, with each leave Plaintiff took, the aggregate FMLA leave she had taken increased. Thus, unlike in discrimination cases where the actor allegedly acts because of a plaintiff's immutable characteristic, the same-actor inference applies weakly here because the person being acted upon "changed": at the time she was terminated, Plaintiff had taken more FMLA leave, and was more likely to take significant FMLA leave in the future, than at any time she was appointed by Westphal. <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 154-55 (2d Cir. 2004) (rejecting application of the same-actor

_____

[14] Defendant asserts that Plaintiff "testified affirmatively that she believed the reason she was terminated was that she was timid and sensitive (as opposed to Ms. Helas, who was not)." Mem. at 18. But in the deposition passage quoted by Defendant, Plaintiff did no such thing. Plaintiff acknowledged merely that she believed Westphal put "see me" notes on her desk, rather than Helas's, because he knew that Plaintiff was a "very sensitive person" whereas Helas would swear at Westphal and make him "back off." Dkt. No. 23-8 ("Terry Deposition") at 133-34. That Westphal may have felt more comfortable bullying Plaintiff than Helas for taking leave does not strongly suggest that he harbored no retaliatory animus, particularly given Westphal and Helas's close personal relationship.

inference where plaintiff's actions had changed the way his employer perceived him); see also

Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009) ("[A]s several

courts have found, the same-actor inference is permissive, not mandatory.").  For the same reason,

Westphal's non-termination of Plaintiff for leaving the CLE session early in 2009 is not highly

suggestive of an absence of retaliatory animus.  This is particularly so in light of Westphal's failure

to impose any discipline on Plaintiff, thereby suggesting that the offense was not substantial enough

to credibly support termination.

     Defendant also argues that Westphal's approval of Plaintiff's FMLA-leave requests further

indicates a lack of retaliatory animus.  Mem. at 19.  But Westphal, as a lawyer, was unlikely to

commit an act whose illegality Plaintiff could easily demonstrate; as Defendant acknowledges, a

claim for denial of FMLA leave, unlike an FMLA retaliation claim, requires no proof of motive.

See Mem. at 21-23.

### D.  Conclusion

     Defendant has presented extensive evidence of Plaintiff's performance issues.  A reasonable

factfinder would be hard-pressed to find that those issues played no role in Westphal's decision to

terminate her.  But Plaintiff has offered evidence that she was terminated on the day she returned

from FMLA leave, that Westphal had repeatedly and explicitly expressed hostility towards her prior

FMLA leave, and that Westphal did not mention performance when he terminated her.  Plaintiff's

evidence regarding pretext is stronger with respect to some of Defendant's proffered non-retaliatory

reasons than others.  But "if a plaintiff can produce evidence that casts substantial doubt on some of

the proffered reasons of the employer, such evidence may sufficiently undermine the employer's

other proffered reasons." Fuentes v. Perskie, 32 F.3d 759, 764 & n.7 (3d Cir. 1994).  Ultimately,

the record contains sufficient evidence upon which a reasonable factfinder could determine that Plaintiff's FMLA leave was a motivating factor in Westphal's decision to terminate her employment.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 23) for summary judgment is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:       September  30, 2013
                   Albany, NY

Lawrence E. Kahn
U.S. District Judge